IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TC LAGUNA NIGUEL SENIOR, LLC., | ) | Case No. 10-11334 (CSS) |
| | ) | |
| Debtor. | ) | |

## **AFFIDAVIT OF HARRY LAKE IN SUPPORT OF FILING OF CHAPTER 11 CASE**

| | |
|---|---|
| STATE OF CALIFORNIA ) | |
| ) | ss. |
| COUNTY OF LOS ANGELES ) | |

BEFORE ME, the undersigned authority, on this day personally appeared HARRY LAKE, who having been duly sworn states under oath as follows:

1. My name is Harry Lake. I am over the age of 18, of sound mind, and duly authorized and qualified to testify to the matters stated herein. This affidavit is given based upon my personal knowledge.

2. I am a principal in the Acquisitions-Western Region Development and Investment division of Trammell Crow Company, which is the ultimate owner (through wholly-owned subsidiaries) of 100% of the membership interests in TC Laguna Niguel Senior, LLC, a Delaware limited liability company ("**Debtor**"), the debtor in the within proceedings.

3. The Debtor was formed (under the name "Valeo TC Laguna Niguel Senior, LLC") in July, 2007 by an affiliate of Trammell Crow Company named TC Laguna Niguel, LLC, a Delaware limited liability company ("**TCLN**") and Valeo Laguna Niguel, LLC, a California limited liability company ("**VLN**"), which was the managing member and which was

an affiliate of Valeo Companies, Inc. ("**Valeo**"). Valeo was a real estate developer which was under contract for the acquisition of approximately 3.5 acres of land in Laguna Niguel, California, which was to be re-entitled and then developed as age restricted condominiums.

4. VLN contributed its interest in the purchase and sale agreement and some cash into the Debtor, and TCLN contributed the majority of the cash (being the "financial partner"). It was the responsibility of VLN, as managing member, to secure all necessary entitlements from the City of Laguna Niguel to develop the land for the purposes described above.

5. The purchase price for the land was funded, in part, by a loan from Commercial Bank of California ("**Commercial Bank**") in the amount of $5,650,000 which was secured by a first lien deed of trust on the land. Subsequent to the closing, an additional $750,000 was borrowed by the Debtor from Neighborhood Housing Services of Orange County, Inc. ("**NHS**"), which was secured by a second lien deed of trust on the land. The loans were guaranteed by Valeo and several of its principals.

6. For approximately 2 years after closing the acquisition of the land, VLN, on behalf of Debtor, sought to obtain the required entitlements from the City of Laguna Niguel, but was not successful. Further, an arbitration was instituted against the Debtor by Shepherd of the Hills Church of Laguna Niguel (the "**Church**") because of a dispute involving a lot line adjustment which was to be agreed upon by the Debtor and the Church (the Church was one of the parties who sold the land to the Debtor, and part of the development plan was to do a lot line adjustment so that the Church could relocate its existing facility, with the old church facility to be torn down for the new senior housing development).

7. In addition to the unanticipated delays resulting from the matters described in Paragraph 6 above, the general economic downturn in the country made new credit almost impossible to obtain and further impeded the ability of the Debtor to either develop the land or to sell the land to a third party.

8. On or about July 31, 2009, TCLN exercised certain buy-sell rights under the limited liability company agreement of the Debtor and removed VLN as a member of the Debtor. The name of the Debtor was changed to "TC Laguna Niguel Senior, LLC", with TCLN as the sole member.

9. After July 31, 2009, when TCLN obtained management and control over the Debtor, it attempted to resolve the arbitration which was filed by the Church, and at the time of filing of the Chapter 11 petition TCLN believed that it had reached an acceptable settlement, although it was not documented.

10. In addition, Debtor attempted to renegotiate the two loans by, among other things, extending their terms (the Commercial Bank loan matured on November 5, 2009 and the NHS loan matured on October 12, 2009). Initially, both lenders agreed to short-term extensions, but after that Commercial Bank refused to even discuss any further extensions with Debtor, and commenced foreclosure proceedings. The filing of the Chapter 11 petition by Debtor was necessary to avoid the Commercial Bank foreclosure sale from taking place.

11. Debtor also determined, after engaging third party consultants, that due to changes in the economy, age restricted condominiums was not the best use for the land, but that a congregate care retirement facility would be the highest and best use. Debtor resolved entitlement issues which would allow the new use. Debtor also undertook concentrated efforts to locate a buyer for the land who would develop the land as a congregate care retirement facility,

because it was no longer economically feasible for Debtor to develop the land. In or about January, 2010 Debtor identified a viable purchaser of the land, who was willing to develop it as a congregate care retirement facility, and after due diligence and protracted negotiations, on April 20, 2010 Debtor exchanged a letter of intent with the potential purchaser. The parties are currently negotiating a purchase agreement.

12. If the sale of the land were to close, there would be more than enough money to pay off both secured lenders, all unsecured creditors, and there would still be equity left over for the Debtor. This information was conveyed to Commercial Bank, but again, the bank refused to negotiate for another extension, even a short-term extension to facilitate a sale.

13. When the interest of VLN in the Debtor was acquired by TCLN, pursuant to the limited liability company agreement of the Debtor, the Debtor agreed to indemnify the parties who had guarantee the loan to Commercial Bank. Hence, all of such guarantors are unsecured creditors of the Debtor.

14. Further, the arbitration proceeding had not completed as of the date of the filing of the Chapter 11 petition, and the Church retains the right to pursue a claim for monetary damages (in addition to an award which established the final boundary lines for the lot line adjustment). Hence, the Church is also an unsecured creditor of the Debtor.

_____
HARRY LAKE

STATE OF CALIFORNIA
COUNTY OF LOS ANGELES

SUBSCRIBED AND SWORN to (or affirmed) before me on this 30th day of April, 2010, by HARRY LAKE, proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.



_____
NOTARY PUBLIC

[SEAL